[No. F011544. Fifth Dist. May 14, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL SANTOYA VEGA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I and parts III through V.

**COUNSEL**

Leo Paoli, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Raymond L. Brosterhous II and Lisbeth Bellet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STONE (W. A.), J.**—Appellant, Raul Santoya Vega, appeals his conviction of robbery, vehicle theft, and kidnapping. He challenges the sufficiency of the evidence to sustain the robbery conviction, the propriety of conviction and punishment for both robbery and vehicle theft based upon the same course of conduct, and the correctness of two jury instructions, CALJIC No. 2.71 and CALJIC No. 2.52.

### STATEMENT OF THE CASE

The People charged appellant and his codefendant, Micaela Alvarez Vega, jointly with robbery (Pen. Code, § 211) (count 1), vehicle theft (Veh. Code, § 10851) (count 2) and kidnapping (Pen. Code, § 207, subd. (a)) (count 3). A jury convicted appellant of all three counts and his codefendant of vehicle theft. Appellant received a prison term of six years, as follows: the middle term of five years for kidnapping; one-third of the middle term of three years for robbery, to run consecutively pursuant to Penal Code section 1170.1, subdivision (a); and the middle term of two years for vehicle theft, stayed pursuant to Penal Code section 654.

### STATEMENT OF FACTS

On the afternoon of August 17, 1988, a woman approached Simona Perez in a parking lot near the Fulton Mall in downtown Fresno. The woman requested that Mrs. Perez give her and appellant, whom she identified as her husband, a ride to the Greyhound bus station and to a repair shop to pick up their car. Mrs. Perez agreed, and the two entered the back seat of the car. Mrs. Perez's children, eight-year-old Estaban and two-year-old Maria, sat in the front seat with their mother. When they arrived at the bus station the woman retrieved a traveling bag and returned to the car. At the direction of appellant, Mrs. Perez proceeded onto Highway 99, traveling south. She decided the trip was taking too long and she needed to return home to her husband who was taking care of their three-month-old baby. When she deviated from the directions and left the highway, the woman told her to get back onto the highway, but Mrs. Perez refused. As Mrs. Perez headed toward her home, appellant began complaining that he had to use a bathroom and insisted that they stop. When Mrs. Perez stopped at a store, he insisted that she accompany him to find out where the restrooms were located because he did not speak English. She left the keys in the car with the engine running while she went into the store with appellant. As she was returning to her car Mrs. Perez met her children on their way into the store. Estaban told her that he had been sent to buy the woman a soda.

Mrs. Perez turned the children around and began walking toward the car. She noticed that the woman was driving the car out of the parking lot of the store and into the street. She ran after the car, opened the front passenger door and reached for the keys. As Mrs. Perez and the woman struggled for the keys, appellant approached from behind and pushed Mrs. Perez into the front seat of the car. He jumped into the back seat and placed one hand around her neck and one hand across her mouth and nose, choking her and preventing her from breathing. Somehow she managed to scream to Estaban to get help. Several blocks later she was able to free herself from his grip, kick the door open and jump from the car as it slowed to stop at a traffic light. Appellant and the woman drove away.

Several hours later Officer Ayers of the California Highway Patrol found the Perez car approximately 150 miles south of Fresno, abandoned on an off-ramp of Interstate 5. Upon running a check of the license plate numbers, the officer discovered the car had been stolen. He also learned that two possible suspects had been detained at a Texaco station approximately one mile from the abandoned vehicle. Mrs. Perez's descriptions of the car thieves matched those of the suspects. Officers arrested both suspects and transported them to the Kern County jail.

After obtaining a waiver of his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights, Officer Ayers questioned appellant through an interpreter at the Kern County jail regarding the vehicle theft and kidnapping. The officer's testimony regarding that interview was, in part, as follows:

"[OFFICER AYERS:] . . . First question was 'Where did you get the car.'

"Q. [PROSECUTOR:] Okay. And what did he answer?

"A. 'A ride was given by some guy in Turlock who had a pickup truck.'

"Q. And what was your next question?

"A. 'Where did the guy go.'

"Q. The answer?

"A. 'The ride stopped at a gas station and the guy continued onto [*sic*] L.A.'

"Q. Okay. With regard—what was your next question?

"A. 'Where were you going?'

"Q. And the answer?

"A. 'To Mexico to visit my mother.'

"Q. Okay. And next question?

"A. 'Why did you get off in Lebec.'

". . . . . . . . . . . . . . . . . .

"A. He said 'That's as far as the guy would go.'

"Q. The guy would go?

"A. The guy would go.

"Q. He didn't say anything that's as far as the car would go?

"A. No, sir, the guy."

Officer Jacobo, a Spanish-speaking detective from the Fresno Police Department, subsequently interviewed appellant at the Kern County jail. During this interview appellant gave a different version of the events preceding his arrest. Officer Jacobo related appellant's statement to him regarding the vehicle theft and kidnapping as follows:

"Q. [PROSECUTOR:] can you tell us basically what the statement of Mr. Vega was?

"A. [OFFICER JACOBO:] Okay. He told me that the victim was asked for a ride and I asked him where this had occurred. And he told me it was near the Greyhound Bus Depo [sic] in Fresno. And he explained to me that his mother was in Mexico and is a diabetic and was extremely ill and that he wanted to go to Mexico to visit her. And he also told me he only had 38 dollars in his possession and that that was not enough for him to get to Mexico. And he told me that he had taken the vehicle only to get him closer to Mexico.

"Q. What was the intention?

"A. He explained that he was to get a bus from Los Angeles or take the vehicle to Los Angeles and from there get a bus to Mexico. He also told me that he had no intention of harming anyone and in fact that no one else had been injured. He also told me he had not intended to steal the vehicle on a permanent basis and it was an emergency that brought—brought this inci-

dent—that was brought forth for this incident, that because of the emergency that this happened.

"Q. Okay. Now at the time that the ride was first requested, did you ask him who was in the vehicle besides the victim?

"A. Yes, I did.

"Q. And what did he say?

"A. He told me that there was a little boy and a little girl in the vehicle.

"Q. Okay. What did you ask him next?

"A. I asked him why the vehicle was left at the location next to the freeway, and he explained to me that the vehicle had problems, that it overheated, and it would not run.

". . . . . . . . . . . . . . . . . . . .

"Q. What did you ask him next?

"A. I asked him where he had come from prior to coming to Fresno, and he said that he had come from Turlock."

During the trip from the Kern County jail to Fresno, Officer Jacobo asked appellant several more questions:

"[OFFICER JACOBO:] . . . I asked him about the keys to the vehicle, whether the victim had wanted the keys to the—her vehicle. He told me that she did want the keys and this was when she had gotten to the right front passenger side of the car and she was trying to get the keys.

"Q. [PROSECUTOR:] Okay. So somehow the female got seated in the car?

"A. Yes. She was seated in the front seat.

"Q. The vehicle then what?

"A. The vehicle then left and the victim was yelling and screaming.

". . . . . . . . . . . . . . . . .

"Q. Then he explained what to the victim?

"A. He explained to the victim that she should not call the police and that the vehicle was needed for an emergency.

"Q. Now all this time you're talking to Raul?

"A. That's correct.

". . . . . . . . . . . . . . . . . . .

"Q. What did you ask him next?

"A. I asked him if he had pushed the vehicle into or the victim into her vehicle.

"Q. And he said what?

"A. He told me that he had not.

"Q. Okay. And your next question?

"A. I asked him if he had placed his hands on the victim's mouth in order for her to comply. He told me that he hadn't, and that if he would have, he probably would have been bitten by the victim."

Appellant did not testify at his trial. His codefendant, Micaela Vega, testified that appellant was a relative of her husband and that she had been forced to accompany him and to assist him in stealing the Perez vehicle under threat of being beaten. She also testified that his purpose in stealing the car was to go to Mexico to be with his mother who was ill.

## DISCUSSION

### PART I*

. . . . . . . . . . . . . . . . . . . .

### PART II

### *CALJIC NO. 2.71*

■ The court instructed the jury with CALJIC No. 2.71 as follows: "An admission is a statement made by a defendant other than at his trial

---

* See footnote, *ante,* page 310.

which does not by itself acknowledge his guilt of the crime or crimes for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. You are the exclusive judges as to whether the defendant made an admission and, if so, whether such statement is true in whole or in part. If you should find the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. Evidence of an oral admission of the defendant should be viewed with caution."

We have set out the three statements by appellant. First, he told Officer Ayers that a man in a pickup truck had taken him from Turlock to the gas station where he was apprehended. He did not mention taking the Perez vehicle or abandoning it. During argument appellant's counsel suggested it was not interpreted accurately from Spanish to English and what he had in fact told the officer was that he had received a ride from the truck driver to Fresno, not to the gas station in Lebec. In his second and third conversations with police, he admitted taking the vehicle without the permission of Mrs. Perez and against her will, but denied he injured her. He stated he did not intend to steal the car, but had intended only to use it temporarily because of an emergency.

Appellant's sole defense to the robbery charge was that he had no intent to steal. He contends that the effect of the instruction was to tell the jury to view skeptically his statement to the police that he did not intend to steal Mrs. Perez's car. According to appellant, because his statement was the only evidence regarding the absence of the requisite element of intent, the court committed reversible error by instructing with CALJIC No. 2.71. We disagree.

CALJIC No. 2.71 tells the jury an admission is a statement that tends to prove guilt. It then instructs the jury to determine whether defendant made an admission, i.e., whether the defendant made the statement *and* whether the statement tends to prove guilt when considered with the rest of the evidence. In light of the definition of "admission," if the jury determines a statement does not tend to prove guilt when considered with the other evidence, it is not an admission. The cautionary language instructs the jury to view evidence of an *admission* with caution. By its terms, the language applies only to statements which tend to prove guilt and not to statements which do not.

We recognize it is not uncommon that a single statement may tend to prove guilt or innocence, depending upon the state of the remaining evi-

dence and the issue for which it is being considered. Many times extrajudicial statements of defendants, especially when made in the context of questioning by authorities, have the purpose of asserting innocence. Although a statement *when made* may not be incriminating, when considered with the rest of the evidence at trial it may nevertheless be viewed as an admission. For example, a defendant's statement denying participation in a crime may create an inference of incredibility or consciousness of guilt when considered along with other evidence connecting the defendant with the crime. That same statement may be purely exculpatory when considered in the absence of that other evidence. (See *People* v. *Cole* (1903) 141 Cal. 88 [74 P. 547].) Similarly, a statement by a defendant purportedly giving an innocent explanation of the circumstances may be so implausible that it is incredible, thereby tending to prove guilt. Yet the implausible explanation may still be relied upon as a defense.

Still another scenario is that presented in this case when a defendant has apparently made inconsistent statements regarding the circumstances of the offense; he denies he made some of the statements, but relies on others which have an arguably exculpatory meaning.

Must the trial court sua sponte modify the instructions to fit each possible interpretation the jury may give to defendant's extrajudicial statements? We think not. Jurors are presumed to understand and follow the court's instructions. (*People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406].) We are convinced a jury is capable of discerning whether an extrajudicial statement is an admission, which they are instructed to view with caution, or whether the statement is not an admission, to which the cautionary language does not apply.

## PARTS III-V*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The judgment is modified to provide that sentence on count 1 is suspended pursuant to Penal Code section 654 pending completion of sentence on count 3; said stay to become permanent upon completion of the sentence on count 3. In all other respects, the judgment is affirmed. The trial court

---

* See footnote, *ante*, page 310.

shall forthwith prepare and forward to the Director of Corrections an amended abstract of judgment conforming to the modification ordered herein.

Martin, Acting P. J., and Baxter, J., concurred.